## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL LEE, et al.,

                Plaintiffs

        v.

GOLF TRANSPORTATION, INC., et al.,

             Defendants.

CIVIL ACTION NO. 3:21-CV-01948

(MEHALCHICK, M.J.)[1]

### MEMORANDUM

Before the Court is a motion for summary judgment filed by Defendant Coyote Logistics, LLC ("Coyote") on June 2, 2023. (Doc. 123).[2] This consolidated action arises out of two wrongful death and survival actions filed by Plaintiffs Michael Lee as Administrator of the Estate of Raven Lee and Anderson Bastone as Administrator of the Estate of Chaz Bastone (collectively, "Plaintiffs"). (Doc. 55). On November 16, 2021, Plaintiff Lee filed a wrongful death and survival action against Defendants Golf Transportation, Inc. ("Golf"), JP Logistics, O'Connor Trucking, Inc. ("O'Connor"), UNFI Transport LLC, and United National Foods Inc. ("UNFI"). (Doc. 1). On April 28, 2022, Lee filed an amended complaint adding Coyote as a new Defendant. (Doc. 29). On June 3, 2022, Plaintiff Bastone file a wrongful death and survival action against Golf, JP Logistics, O'Connor, UNFI Transport LLC, UNFI, and Coyote. *Bastone v. Golf Transportation, Inc.*, No. 3:22-CV-00878, ECF No. 1.

---

[1] The parties have consented to proceed before the undersigned United States Magistrate Judge pursuant to Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). (Doc. 27).

[2] On the same date, Defendant JP Logistics, Inc. ("JP Logistics") also filed a motion for summary judgment (Doc. 126). As the Court has been notified that the claims against Defendant JP Logistics, Inc. have been resolved, that motion will be denied as moot.

On October 4, 2022, the Court consolidated these actions and ordered that all future filings shall be filed in 3:21-CV-01948. (Doc. 55).

Both complaints allege that on October 7, 2020, Plaintiffs' decedents, Raven E. Lee and Chaz Bastone, were killed in a motor vehicle accident involving a tractor-trailer driven by Greg Leksowski ("Leksowski"). (Doc. 29); *Bastone v. Golf Transportation, Inc.*, No. 3:22-CV-00878, ECF No. 1. Coyote filed an answer to Lee's amended complaint on May 31, 2022, and an answer to Bastone's complaint on October 10, 2022. (Doc. 36; Doc. 58). On June 2, 2023, Defendant Coyote moved for summary judgment. (Doc. 123). On July 21, 2023, the parties appeared before the Court for oral argument on the motions for summary judgment. For the following reasons, Coyote's motion for summary judgment will be granted, and JP Logistics' motion for summary judgment will be denied.

## I.   FACTUAL BACKGROUND[3]

Coyote is authorized by the Federal Motor Carrier Safety Administration ("FMCSA") to operate as a Registered Property Broker pursuant to a license issued to Number MC-561135-B. (Doc. 124, ¶ 10; Doc. 124-1; Doc. 124-2). Coyote contracted with co-Defendant Golf, a motor carrier licensed by the FMCSA, to operate as a for-hire motor carrier pursuant

---

[3] This factual background is taken from Coyote's statement of material facts and accompanying exhibits. (Doc. 124). Pursuant to Local Rule 56.1, Plaintiffs provided their responses to Coyote's statement of facts and provided accompanying exhibits. (Doc. 149). Where Plaintiffs dispute facts and supports those disputes in the record, as required by Local Rule 56.1, those disputes are noted. Pursuant to Local Rule 56.1, the Court accepts as true all undisputed material facts supported by the record. Where the record evinces a disputed fact, the Court will take notice. In addition, the facts have been taken in the light most favorable to Plaintiffs as the non-moving parties, with all reasonable inferences drawn in their favor.

to authority issued in DOT Number 2945959 (MC-997153). (Doc. 124, ¶ 11; Doc. 124-3).

Golf did not have broker authority. (Doc. 124, ¶ 12; Doc. 124-3, at 3).

In the Carrier Agreement, Coyote is referred to as "BROKER," and Golf is referred to as "CARRIER." (Doc. 124, ¶¶ 13-14; Doc. 124-3, at 4-5). Coyote and Golf Transportation agreed, in relevant part, as follows:

1. **SCOPE OF WORK**. BROKER agrees to cause freight to be tendered to CARRIER, and CARRIER agrees to pick up, transport, and deliver such freight and provide all such services as BROKER shall request on all freight tendered by BROKER as set forth in a Load Confirmation Sheet (the "Services"). **CARRIER warrants and agrees that all freight tendered to it by BROKER pursuant to this Agreement shall only be transported by CARRIER on, in or with equipment owned by CARRIER or leased to CARRIER** under a lease having a duration of more than thirty (30) days and operating under CARRIER's operating authorities. **CARRIER shall not, in any manner, subcontract, broker, or tender to any third party for transportation any freight tendered to CARRIER by BROKER for transportation pursuant to this Agreement**, except to the extent CARRIER uses the services of an owner/operator and provided that the owner/operator is providing such transportation services and operating equipment duly authorized under CARRIER's operating authority. In addition to other remedies conferred by this Agreement, any violation of this article shall act as a bar to CARRIER's right to collect payment for any shipment handled in a manner which violates this article.

5. **CARRIER WARRANTIES AND REPRESENTATIONS TO BROKER AND ITS CUSTOMERS**.

   CARRIER warrants and represents the following: . . .

   D. CARRIER will provide, operate, and maintain in satisfactory and safe working condition all motor vehicles, trailers and equipment necessary to perform Services pursuant to this Agreement. CARRIER will (i) provide all necessary and fully qualified drivers, (ii) ensure that each driver is suitably trained for operation of vehicles and other equipment . . . .

13. **MISCELLANEOUS**.

    A. Independent Contractor. It is understood and agreed that CARRIER is an independent contractor and not an agent, joint venture, owner-

operator, or employee of BROKER. CARRIER has the sole and exclusive direction and control over the manner in which CARRIER and its employees, contractors, or others perform Services. Such individuals shall be considered employees or representatives of CARRIER only and shall be subject to employment, discharge, discipline, and control solely and exclusively by CARRIER, which shall be fully responsible for their acts. It is acknowledged and agreed that BROKER has no control of any kind over CARRIER or its operations, employees, drivers, or equipment. BROKER is not and will not be responsible for any debts, liabilities, or obligations incurred by CARRIER in the performance of its business. CARRIER assumes full responsibility for all commissions, salaries, insurance, taxes, pensions, and benefits of CARRIER's agents, contractors, sub-contractors, and/or employees in connection with CARRIER's performance pursuant to this Agreement.

(Doc. 124, ¶ 15; Doc. 124-3, at 5-6, 17).

On September 24, 2020, Coyote tendered Load 20787152 to Golf consisting of Pick-Up Numbers 5838948 and 5839071. (Doc. 124, ¶ 16; Doc. 124-4). UNFI was the consignee, or customer, who retained Coyote to arrange for the transportation of Load 20787152. (Doc. 124, ¶ 17; Doc. 124-5). Golf agreed to pick up Load 20787152 at Pacific Foods in Wilsonville, Oregon and deliver Load 20787152 to UNFI-Montgomery in Montgomery, New York. (Doc. 124, ¶ 18; Doc. 124-4). Plaintiffs specifically denied that Exhibit 'D' was the controlling Rate Confirmation contract between Golf and Coyote for the subject load, submitting that there were three Rate Confirmation sheets provided to Golf by Coyote for the Subject Load. (Doc. 149, ¶¶ 18-19; Doc. 149-2, Leite Depo. Tr. 79:7-12, Oct. 12, 2022). The Rate Confirmation for Load 20787152 specifically stated: "THIS LOAD SHALL NOT BE DOUBLE BROKERED." (Doc. 124, ¶ 19; Doc. 124-4, at 4). A portion of Load 20787152, consisting of Pick-Up/Order Number 5838948, was picked up September 30, 2020. (Doc. 124, ¶ 20; Doc. 124-5). Coyote and the Plaintiffs dispute whether Golf was placed in any sort of "do not use" status by Coyote, but do agree that Golf had been placed in "pending" status while it investigated allegations of violations of transloading. (Doc. 149, ¶¶ 20-22b; Doc. 149-4; Doc. 146, ¶¶ 20-22).

According to the Bill of Lading, the Load consisting of Pick-Up/Order Number 5838948 ("Subject Load") was property consisting of soup. (Doc. 124, ¶ 21; Doc. 124-5). The Subject Load was picked up by "Victor Bordo GOLF." (Doc. 124, ¶ 22; Doc. 124-5, at 1). The corporate representative of Golf, Mark Myslek, agreed that Victor Bordo picked up Load 20787151 on behalf of Golf. (Doc. 124, ¶ 23; Doc. 124-6, Myslek Depo. Tr. 26:4-27:19, Oct. 27, 2022). Neither Golf nor Myslek know who Victor Bordo is. (Doc. 124, ¶ 24; Doc. 124-6, Myslek Depo. Tr. 26:4-27:19, Oct. 27, 2022; Doc. 124-7, at 12).

Golf does not know what motor carrier picked up Load 20787152. (Doc. 124, ¶ 25;

Doc. 124-7, at 8). Golf does not know how Load 20787152 got from Wilsonville, Oregon to

4

Chicago. (Doc. 124, ¶ 26; Doc. 124-6, Myslek Depo. Tr. 94:4-6, Oct. 27, 2022). Golf does not know what tractor and trailer picked up Load 20787152 in Wilsonville, Oregon. (Doc. 124, ¶ 27; Doc. 124-6, Myslek Depo. Tr. 94:7-8, Oct. 27, 2022). Myslek explained that when a load was brokered to Golf by Coyote, he would frequently have Yanas Transport pick up that load and sign the Bill of Lading for Golf without Coyote's knowledge. (Doc. 124, ¶ 28; Doc. 125-6, Myslek Depo. Tr. 31:10-32:5, Oct. 27, 2022). Myslek testified that nobody told Coyote about using another carrier to pick up loads for Golf and that there was no reason for Coyote to know about it. (Doc. 124, ¶ 29; Doc. 124-6, Myslek Depo. Tr. 32:1-5, Oct. 27, 2022). Myslek testified that he assumed that Coyote was not aware that third party carriers were picking up loads that had brokered to Coyote to Golf. (Doc. 124, ¶ 30; Doc. 124-6, Myslek Depo. Tr. 32:11-23, Oct. 27, 2022). Myslek also testified that he believed double brokering was common in the industry and that he did not know whether Coytoe was aware that he was double brokering loads to other, third-party carriers. (Doc. 149, ¶ 30; Doc. 124-6, Myslek Depo. Tr. 32:11-23, Oct. 27, 2022). In violation of the Carrier Agreement and the Rate Confirmation, Golf permitted Load 20787152 to be delivered by O'Connor. (Doc. 124, ¶ 31; Doc. 124-7, at 18-19).

The driver of the truck involved in the accident was Leksowski. (Doc. 124, ¶ 32; Doc. 124-6, Myslek Depo. Tr. 115:6-9, Oct. 27, 2022). Leksowski was not employed by Coyote, but was an independent contractor of O'Connor. (Doc. 124, ¶¶ 33-34; Doc. 124-6, Myslek Depo. Tr. 115:12-13, Oct. 27, 2022; Doc. 124-8, Leksowski Depo. Tr. 16:20-17:2, Oct. 27, 2022; Doc. 124-9, at 8). It was in the course and scope of his employee and/or agency relationship with O'Connor that Leksowski was driving the commercial motor vehicle at the time of the accident. (Doc. 124, ¶ 35; Doc. 124-10, at 4). O'Connor, as the motor carrier who

employed Leksowski, produced the driver file, including the application of employment for Leksowski. (Doc. 124, ¶ 36; Doc. 124-9, at 6; Doc. 124-11, at 5). Leksowski was not employed by Golf at the time of the accident, testified that he has never worked for Golf, and further testified that he had never heard of any company called "Coyote Logistics." (Doc. 124, ¶¶ 37-39; Doc. 124-8, Leksowski Depo. Tr. 10:24-11:4, 77:2-8, 101:21-25, Oct. 27, 2022; Doc. 124-12, at 5-6).

The truck driven by Leksowski was not owned by Coyote. (Doc. 124, ¶ 40;). The Volvo tractor driven by Leksowski was owned by O'Connor, not Coyote. (Doc. 124, ¶¶ 40-41; Doc. 124-9, at 6; Doc. 124-13, Walsh Depo. Tr. 17:4-10, Oct. 12, 2022; Doc. 124-14; Doc. 124-6, Myslek Depo. Tr. 115:18-20, Oct. 27, 2022). O'Connor was the Motor Carrier operating the Volvo tractor at the time of the accident was O'Connor. (Doc. 124, ¶ 42; Doc. 124-14, at 4; Doc. 124-15; Doc. 124-16). The Bill of Lading, which remains with the load until delivery, identified 'Golf' as the motor carrier responsible for the transport of Load 20787153. (Doc. 149, ¶¶ 41-42; Doc. 124-5).

The registered owner of the Wabash National trailer attached to the tractor that Leksowski was driving was JP Logistics, not Coyote. (Doc. 124, ¶¶ 43-44; Doc. 124-15, at 2; Doc. 124-8, Leksowski Depo. Tr. 47:20-22, 97:11-14, Oct. 27, 2022; Doc. 124-6, Myslek Depo. Tr. 115:21-116:1, Oct. 27, 2022). When Gulf received the rate confirmation for the Subject Load, Golf did not tell Coyote that the load would be transported by O'Connor. (Doc. 124, ¶ 45; Doc. 124-6, Myslek Depo. Tr. 118:3-9, Oct. 27, 2022). Golf, not Coyote, double brokered the Subject Load. (Doc. 124, ¶ 46; Doc. 124-7, at 20-21).

Coyote did not dispatch the Volvo driven by Leksowski at the time of the subject accident. (Doc. 124, ¶ 48; Doc. 124-7, at 26). Coyote did not exercise any control over

6

dispatching of the Volvo driven by Leksowski at the time of the subject accident. (Doc. 124, ¶ 49; Doc. 124-7, at 27). Golf did not tell Coyote that Leksowski would deliver Load 20787152. (Doc. 124, ¶ 50; Doc. 124-7, at 28). Leksowski was not driving under Golf's motor carrier authority at the time of the subject accident. (Doc. 124, ¶ 51; Doc. 124-7, at 29). Leksowski was not selected by Coyote to deliver Load 20787152. (Doc. 124, ¶ 52; Doc. 124-7, at 30). Golf identified the driver as "Ted" and did not tell Coyote that the driver assigned to the Subject Load was Leksowski. (Doc. 124, ¶ 53; Doc. 124-17, Jordan Depo. Tr. 78:10-13, Oct. 10, 2022; Doc. 124-18, Hahn Depo. Tr. 74:18-75:12, Jan. 16, 2023). Coyote did not learn about this accident until October 21, 2020, approximately two weeks after it occurred. (Doc. 124, ¶ 54; Doc. 124-17, Jordan Depo. Tr. 99:19-100:4, Oct. 10, 2022).

## II.  STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

7

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

"Although the party opposing summary judgment is entitled to the 'benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact.'" *Velentzas v. U.S.*, No. 4: 07-CV-1255, 2010 WL 3896192, at *7 (M.D. Pa. Aug. 31, 2010) (quoting *Goode v. Nash*, 241 F. App'x 868, 869 (3d Cir. 2007)) (citation omitted); *see also Beenick v. LeFebvre*, 684 F. App'x 200, 206 (3d Cir. 2017) (stating the purpose of requiring parties to cite to particular parts of the record in their briefs about a motion for summary judgment is to "assist the court in locating materials buried in a voluminous record") (quoting Fed. R. Civ. P. 56(c)(1)(A)). The opposing party "cannot rest solely on assertions made in the pleadings, legal memorandum, or oral argument." *Velentzas*, 2010 WL 3896192, at *7 (quoting *Goode*, 241 F. App'x at 869). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Jakimas v. Hoffmann–La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

### III.   DISCUSSION

Coyote submits that Plaintiffs' claims against it are preempted by the Federal Aviation Administration Authorization Act ("FAAAA"), 49 U.S.C. § 14501(c)(1). (Doc. 125, at 19). Alternatively, Coyote argues that Plaintiffs' claims against Coyote in Counts III, IV, VI, and XI, and claim for punitive damages should be dismissed with prejudice as a matter of law. (Doc. 125, at 39-54). In opposition, Plaintiffs argue that the FAAAA does not preempt their claims against Coyote because prevailing authority confirms that the FAAAA does not preempt state law negligence claims. (Doc. 137, at 10-28). In addition, Plaintiffs submit that genuine issues of material fact exist which preclude the entry of summary judgment. (Doc. 137, at 28-40).

### A.   FEDERAL AVIATION ADMINISTRATION AUTHORIZATION ACT PREEMPTION

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. If a state law "conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993). The law recognizes three types of federal preemption: express preemption, field preemption, and conflict preemption. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). "Preemption is an affirmative defense that the defendant has the burden to prove." *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 (3d Cir. 2018).

Congress passed the Motor Carrier Act of 1980, 94 Stat. 793, to "deregulate" the

interstate truck shipping industry by replacing a patchwork of state regulations with a federal

regime. *See Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 368 (2008). In 1994,

Congress added to this federal regime by passing the FAAAA to deregulate the trucking

industry and preempt state trucking regulations. *Rowe*, 552 U.S. at 368. The FAAAA

expressly provides preemption of state regulation of the trucking industry, 49 U.S.C. §

14501(c). That provision provides, in relevant part:

> a State, political subdivision of a State, or political authority of 2 or more States
> may not enact or enforce a law, regulation, or other provision having the force
> and effect of law related to a price, route, or service of any motor carrier . . . or
> any motor private carrier, broker, or freight forwarder with respect to the
> transportation of property.[4]

49 U.S.C.A. § 14501(c)(1); *see Rowe*, 552 U.S. at 368.

Several exceptions then follow. *See* 49 U.S.C. § 14501(c)(2), (3), (5). Relevant here, the

"safety" exception in § 14501(c)(2)(A) provides that express preemption:

> shall not restrict the safety regulatory authority of a State with respect to motor
> vehicles, the authority of a State to impose highway route controls or
> limitations based on the size or weight of the motor vehicle or the hazardous
> nature of the cargo, or the authority of a State to regulate motor carriers with
> regard to minimum amounts of financial responsibility relating to insurance
> requirements and self-insurance authorization.

49 U.S.C. § 14501(c)(2)(A).

---

[4] *See* 49 U.S.C. § 13102(2) ("broker" means a person "selling, providing, or arranging
for, transportation by motor carrier for compensation"), § 13102(23) ("transportation"
includes "a motor vehicle . . . or equipment of any kind related to the movement of passengers
or property" and "services related to that movement, including arranging for, receipt,
delivery, . . . and interchange of passengers and property"); *see also Loyd v. Salazar*, 416
F.Supp.3d 1290, 1297 n.9 (W.D. Ok. 2019) ("[plaintiff] raises a claim of express preemption,
which occurs when the language of the federal statute reveals an express congressional intent
to preempt state law." (citations omitted)).

10

The overarching goal of preemption pursuant to the FAAAA is to avoid situations where "state requirements could easily lead to a patchwork of state service-determining laws, rules and regulations." *Rowe*, 552 U.S. at 373. Congress broadly disallowed state laws that impede its deregulatory goals, but it made a specific carveout for laws within a state's "safety regulatory authority . . . with respect to motor vehicles," even though such laws may burden interstate commerce. *See City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424, 441 (2002) (observing that "a State could, without affront to the statute, pass discrete, nonuniform safety regulations" because the Act's preemption provision in § 14501(c)(1) and its safety exception in § 14501(c)(2)(A) achieve different goals). The Supreme Court has outlined the following four guiding principles for applying preemption pursuant to the FAAAA:

> (1) state enforcement actions having a connection with, or reference to carrier rates, routes, or services are preempted; (2) preemption may occur even if a state law's effect on rates, routes, or services is only indirect; (3) with respect to preemption in this context, it makes no difference whether a state law is consistent or inconsistent with federal regulation; and (4) preemption occurs at least where state laws have a significant impact related to Congress's deregulatory and preemption-related objectives.

> *Rowe*, 552 U.S. at 370 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992)) (interpreting identical provision in Airline Deregulation Act of 1978, 49 U.S.C. § 1305(a)(1)) (quotation marks omitted).

The scope of the federal preemption pursuant to the FAAAA is understood as having a "broad preemptive purpose," *Morales*, 504 U.S. at 383 (interpreting an identical provision of the Airline Deregulation Act), and encompasses even state laws that only have an indirect effect on the price, route, or service of a motor carrier. *Rowe*, 552 U.S. at 370 (explaining that interpretations of the Airline Deregulation Act directly apply to the FAAAA). To be "related to" broker services, the state law in question need only have a "connection with, or reference

11

to" these services. *Rowe*, 552 U.S. at 370 (emphasis removed) (quoting *Morales*, 504 U.S. at 384). A state law may be preempted even if the law's effect on broker services "is only indirect." *Rowe*, 552 U.S. at 370 (quoting *Morales*, 504 U.S. at 386). For example, in *Dan's City Used Cars, Inc. v. Pelkey* ("*Dan's City*"), 569 U.S. 251, 261 (2013), the Supreme Court concluded that the term "transportation" in the FAAAA even includes the storage and handling of goods when those services are "related to the movement" of property. Courts have even found that the FAAAA preempts not only state statutes and administrative regulations, but also state law-based private claims, such as negligence, conversion, and breach of bailment, because such claims fall under the "other provisions with the force of law" language of the provision. *See, e.g.*, *Alpine Fresh, Inc. v. Jala Trucking Corp.*, 181 F.Supp.3d 250, 257 (D.N.J. 2016) (dismissing breach of bailment and negligence claims because the FAAAA expressly preempts these state common law claims); *AMG Res. Corp. v. Wooster Motor Ways, Inc.*, No. 15-3716, 2019 WL 192900, at *4 (D.N.J. Jan. 4, 2019) (finding that state common law claims, including those for conversion and negligence, are preempted by the FAAAA), *aff'd*, 796 F. App'x 96 (3d Cir. 2020); *Smith v. Comair, Inc.*, 134 F.3d 254 (4th Cir. 1998); *Lopez v. Amazon Logistics, Inc.*, 458 F.Supp.3d 505, 512 (N.D. Tex. 2020); *Deerskin Trading Post, Inc. v. United Parcel Service of America, Inc.*, 972 F. Supp. 665, 672 (N.D. Ga. 1997).

The FAAAA's scope does have some limits. The Supreme Court held that the phrase "with respect to the transportation of property" in Section 14501(c)(1) "massively limits the scope of preemption ordered by the FAAAA." *Dan's City*, 569 U.S. at 261 (quotation omitted). Thus, "it is not sufficient that a state law relates to the 'price, route, or service' of a motor carrier in any capacity; the law must also concern a motor carrier's 'transportation of property.'" *Dan's City*, 569 U.S. at 261. And Title 49 defines "transportation," in relevant part,

to include "services related to the movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property." 49 U.S.C. § 13102(23)(B).

The FAAAA will not preempt state laws that merely affect carrier prices, routes, or services in a "tenuous, remote, or peripheral [ ] manner." *Rowe*, 552 U.S. at 371. Additionally, the FAAAA contains a few narrow statutory exceptions, where preemption will not occur. *See Siaci Saint Honore v. M/V Northern Jubilee*, No. 21CV08570 (EP) (JSA), 2022 WL 16948966, at *3 (D.N.J. Nov. 14, 2022). Lastly, courts have consistently found that the FAAAA does not preempt routine breach of contract claims because they only seek enforcement of "privately ordered obligations" and as such do not amount to state-imposed laws, rules, or other provision having the effect of law. *See American Airlines, Inc. v. Wolens*, 513 U.S. 219, 228-29, 233 (1995) (concluding that a breach of contract claim was not preempted, in the context of the Airline Deregulation Act, which the FAAAA's language mirrors and courts interpret similarly, because "[a] remedy confined to a contract's terms simply holds parties to their agreements"); *see also Hartford Fire Ins. Co. v. Dynamic Worldwide Logistics, Inc.*, No. 17-553, 2017 WL 3868702, at *3 (D.N.J. Sept. 5, 2017) (declining to dismiss breach of contract claim because the FAAA does not preempt routine breach of contract claims) (citations omitted).

A fact-specific approach to determine whether a claim is preempted by the FAAAA is consistent with the plain language of Section 14501(c)(1), "which necessarily contains the best evidence of Congress' pre-emptive intent." *Gauthier v. Hard to Stop LLC*, No. 6:20-CV-93, 2022 WL 344557, at *7 (S.D. Ga. Feb. 4, 2022) (quoting *Dan's City*, 569 U.S. at 260).

13

Section 14501(c)(1) expressly provides, in relevant part, that states shall not "enact or enforce any law, rule, regulation, standard, or *other provision having the force and effect of law* related to a price, route, or service of . . . any . . . broker . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1) (emphasis added). It is well-established that the phrase "other provisions having the force and effect of law" includes common law rules. See *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 281–82 (2014) (noting that common law rules are frequently called "provisions" and clearly have the "force and effect of law"); *Gillum*, 2020 WL 444371, at *3 (noting that courts "share an understanding that common law negligence claims embody state laws that *may* be preempted" by the FAAAA); *see also Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) ("Laws of general applicability, even those consistent with federal law, are preempted if they have the 'forbidden significant effect' on rates, routes or services.") (citing *Morales*, 504 U.S. at 386). Indeed, "[a]voiding the creation of . . . 'state enforced rights' is part of the reason the Supreme Court has held that state law tort actions [may be] preempted" by the ADA. *Deerskin*, 972 F. Supp. at 673 (citing *Morales*, 504 U.S. at 388). Therefore, negligence claims against brokers are preempted by Section 14501(c)(1) when their subject matter is "related to" the broker's services and concerns the transportation of property. *See id.* at 672 ("[A] state law tort action against a carrier, where the subject matter of the action is related to the carrier's prices, routes, or services, is a *state enforcement action* having a connection with or reference to a price, route, or service of any motor carrier . . . for purposes of the FAAAA . . . Accordingly, any such state law tort action is preempted by the FAAAA.") (emphasis added). As indicated above, a claim is "related to" the services of a broker when it has a "connection with, or reference" thereto. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008) (quoting *Morales*, 504 U.S. at 384). Such a connection exists where a claim has a "significant impact" on a broker's services. *Id.* at 375. A "broker" is a person "selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). While the term "services" is not expressly defined, the term "transportation" is defined to include "services related to [the movement of passengers or property], including arranging for, receipt, delivery, . . . and interchange of passengers and property." 49 U.S.C. § 13102(23)(B). Additionally, the Eleventh Circuit has stated that "'services' generally represent a bargained-for or anticipated provision of labor from one party to another." *Branche*, 342 F.3d at 1256; *see id.* at 1256–59 (adopting the broad definition of "services" set forth by the Fifth Circuit Court of Appeals in *Hodges*, 44 F.3d at 336). Therefore, Section 14501(c)(1) preempts negligence claims which are sufficiently connected to or have a significant impact on brokers' core bargained-for services: arranging for the transportation of property. *See Ga. Nut Co. v. C.H. Robinson Co.*, No. 17 C 3018, 2017 WL 4864857, at *3 (N.D. Ill. Oct. 26, 2017) ("[S]ervices of a freight broker . . . are focused on arranging how others will transport the property; these services, therefore, fall within the scope of the FAAAA preemption."); *see also Finley v. Dyer*, No. 3:18-CV-78-DMB-

14

JMV, 2018 WL 5284616, at *5 (N.D. Miss. Oct. 24, 2018) ("[A] negligence claim is 'related to' a 'service' when the claim is centered on or derives from a bargained-for or anticipated provision of labor from a broker or other protected carrier.") (internal quotations omitted).

*Gauthier*, 2022 WL 344557, at *7.

At issue in the instant matter is whether the FAAAA preempts Plaintiffs' personal injury claims against Coyote, the broker who selected a motor carrier for transportation of property. Neither the Supreme Court nor the Third Circuit have addressed this specific issue of whether such claims against brokers are preempted by the FAAAA, and "[f]ederal district courts are sharply divided on how to apply these guiding principles." *Loyd v. Salazar*, 416 F.Supp.3d 1290, 1295 (footnote omitted).

In *Bedoya v. American Eagle Express Inc.*, the Third Circuit observed that the FAAAA preemption occurs where a state law has a "direct" and "significant" effect on the "price, route, or service" of interstate transportation. 914 F.3d 812, 823 (3d Cir. 2019). The plaintiffs in *Bedoya* were drivers for the defendant, which was a "logistics company that provides delivery services to various medical organizations." The drivers brought suit pursuant to New Jersey's Wage Payment Law and Wage and Hour Law, alleging that they were misclassified as independent contractors. *Bedoya*, 914 F.3d at 815-16. The defendants moved for judgment on the pleadings, arguing that the FAAAA preempted the plaintiffs' state law claims, but the district court found no preemption and denied the motion. *Bedoya*, 914 F.3d at 816. The Third Circuit upheld the district court's decision, splitting its analysis of the New Jersey law into two parts. First, the analysis includes a determination of whether the challenged state law has a direct impact on prices, routes or services by examining whether the law: "(1) mentions a carrier's prices, routes, or services; (2) specifically targets carriers as opposed to all businesses;

15

and (3) addresses the carrier-customer relationship rather than non-customer-carrier relationships (e.g., carrier-employee)." *Bedoya*, 914 F.3d at 821-23 (citations omitted). The Third Circuit explained that when examining the third factor, courts should look to the challenged state law and determine if the regulation is geared towards "resource inputs" (labor, capital, and technology) or "product outputs" (services provided by the motor carrier industry). *Bedoya*, 914 F.3d at 821-22. "The FAAAA's focus on prices, routes, and services shows that the statute is concerned with the industry's production outputs, and seeks to protect them from state regulation." *Bedoya*, 914 F.3d at 821. "The motor carrier industry's output—the service it provides—is the 'transportation of property from origin to destination.'" *Montoya v. CRST Expedited, Inc.*, 404 F.Supp.3d 364, 401 (D. Mass. 2019) (citing *Bedoya*, 914 F.3d at 821). "Although state laws that regulate industry inputs—labor, capital, and technology— 'may impact costs and may in turn affect prices charged and services provided to customers,' the FAAAA does not preempt these kinds of regulations and laws." *Montoya*, 404 F.Supp.3d at 401 (citing *Bedoya*, 914 F.3d at 821).

At the second step of the analysis, a court should determine whether the challenged law's indirect impact on prices, routes, or services is significant or not. *Bedoya,* 914 F.3d at 822. If the law has a significant impact on the services a motor carrier provides, then the law should be preempted by the FAAAA. The *Bedoya* court explained that:

> To assess whether a law has a significant effect on a carrier's prices, routes, or services, courts should consider whether: (1) the law binds a carrier to provide or not provide a particular price, route, or service; (2) the carrier has various avenues to comply with the law; (3) the law creates a patchwork of regulation that erects barriers to entry, imposes tariffs, or restricts the goods a carrier is permitted to transport; and (4) the law existed in one of the jurisdictions Congress determined lacked laws that regulate intrastate prices, routes, or services and thus, by implication, is a law Congress found not to interfere with the FAAAA's deregulatory goal.

16

*Bedoya*, 914 F.3d at 823.

In *Ciotola v. Star Transp. & Trucking LLC*, the district court relied on *Bedoya* and held that a plaintiff's claims, which involved a negligent hiring claim asserted against a freight broker for failing "to exercise reasonable care in hiring, supervision, retaining, and entrusting" a motor carrier, were not preempted by the FAAAA. *Ciotola v. Star Transp. & Trucking LLC*, 481 F.Supp.3d 375, 388 (M.D. Pa. 2020). Specifically, the district court determined that the FAAAA does not preempt negligence claims against brokers because "Pennsylvania's common-law duty of ordinary care does not mention or target a motor carrier's prices, routes, or services." 481 F.Supp.3d at 387-88. In reaching this conclusion, the court found that "Plaintiff's claims boil down to imposing a duty of ordinary and reasonable care upon [freight brokers]" and explained that "although Pennsylvania's tort law may have some negative financial consequences for a broker or carrier, it is not preempted by the FAAAA. Pennsylvania's tort law is a part of the backdrop of laws that all businesses must follow." *Ciotola*, 481 F.Supp.3d at 388-390; citing *Adames v. May Furniture, Inc.*, 2019 WL 8937042, *8-9 (M.D. Pa. 2019).[5]

Common law tort claims such as those brought against Coyote in this case "fall comfortably within the language of the [ ] preemption provision" that, by its terms, "applies to state 'law[s], regulation[s], or other provision[s] having the force and effect of law.'"

---

[5] In *Adames*, the court recommended denying a motion for summary judgment, finding that movant was a *shipper*, and not a motor vehicle carrier or a broker, and therefore FAAA preemption was not applicable. *Adames*, 2019 WL 8937042, at *9 (M.D. Pa. 2019).

*Northwest*, 572 U.S. at 281-82 (alterations in original) (citation omitted). Thus, the first preemption requirement is easily met. The parties also agree that Coyote is a "broker" as the FAAAA defines it. *See* 49 U.S.C. § 13102(2); *accord* 49 C.F.R. § 371.2(a). Coyote does not suggest that Plaintiffs' claims relate to the "price" or "route" of a broker, arguing only that those claims relate to a broker's "service." *See* 49 U.S.C. § 14501(c)(1).

Although in *Ciotola* the Court held that the FAAAA does not preempt state law tort claims against brokers, other courts treat FAAAA preemption as a fact-intensive inquiry which depends on the nature of the plaintiff's allegations and the underlying claims alleged. *See, e.g., Gauthier*, 2022 WL 344557, at *6 (finding plaintiff's negligent hiring claim against broker is within scope of FAAA preemption because it is "related to" broker's services); *Bailey v. Bell-Rich Transp., LLC*, No. 3:19-CV-461, 2020 WL 3440585, at *6 (M.D. Fl. June 23, 2020) ("To determine whether the FAAAA preempts a plaintiff's claims, courts look to the allegations in the plaintiff's complaint, especially the specific causes of action asserted and the role alleged to have been played by the defendant in the shipping transaction in question."). Courts in the Seventh and Eleventh Circuit have held that Section 14501(c)(1) preempts negligence-based claims against brokers or motor carriers when the subject matter is sufficiently "related to" their prices, routes, or services.

Most recently, in *Ye v. GlobalTranz Enterprises, Inc.*, No. 22-1805, 2023 WL 4567097, at *3 (7th Cir. July 18, 2023), the Seven Circuit determined that the plaintiff's negligent hiring claims against a broker-defendant in selecting a motor carrier to transport freight on its behalf were expressly preempted because the claim "has much more than a tenuous, remote, or peripheral relationship to broker services;" "[t]he relationship is direct;" and "subjecting a

18

broker's hiring decisions to a common-law negligence standard would have significant economic effects." *Ye,* 2023 WL 4567097, at 4. The Seventh Circuit explained:

> In our view, enforcement of such a claim—and the accompanying imposition of liability—would have a significant economic effect on broker services. By recognizing common-law negligence claims, courts would impose in the name of state law a new and clear duty of care on brokers, the breach of which would result in a monetary judgment. This is exactly what [plaintiff] seeks here against [broker-defendant]. To avoid these costly damages payouts, [broker-defendant] and other brokers would change how they conduct their services—for instance, by incurring new costs to evaluate motor carriers. Then, by changing their hiring processes, brokers would likely hire different motor carriers than they would have otherwise hired without the state negligence standards. Indeed, that is the centerpiece of [plaintiff]'s claim: that [broker-defendant] should not have hired [motor carrier].

> *Ye*, 2023 WL 4567097, at 4.

The *Ye* court further explained that this conclusion is consistent with the decision of two other circuit courts. *Ye*, 2023 WL 4567097, at 4 (citing *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1024 (9th Cir. 2020)*, cert. denied*, 142 S. Ct. 2866 (2022) ("[A] claim that imposes an obligation on broker at the point at which they arrange for transportation by motor carrier has a 'connection with' broker services."); *Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261, 1267 (11th Cir. 2023) ("[T]he FAAAA makes plain that [the plaintiff's] negligence claims relate to a broker's services.").

In *Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*, the Eleventh Circuit considered a negligent hiring claim against a freight broker where the plaintiff hired a broker to transport cargo and the broker mistakenly gave the plaintiff's cargo to an entity pretending to be a motor carrier, who then stole the plaintiff's cargo. 65 F.4th at 1267. The plaintiff was reimbursed by its insurance company, who in turn brought a state tort claim against the broker for its negligent selection of the thieving motor carriers. *Aspen*, 65 F.4th at 1267. The broker-

19

defendant argued that the FAAAA preempted the insurance company's negligent hiring claim. *Aspen*, 65 F.4th at 1264-65. The Eleventh Circuit held that negligent hiring claims against brokers are expressly preempted by § 14501(c)(1) under the Supreme Court's broad reading of "related to." *Aspen*, 65 F.4th at 1268 (citing *Morales*, 504 U.S. at 386). Selecting a carrier to transport shipments, according to *Aspen*, "is precisely the brokerage service that" a negligence hiring claim against a freight broker challenges: the broker's "allegedly inadequate selection of a motor carrier to transport . . . shipment." *Aspen*, 65 F.4th at 1267. An allegation of negligence "against a transportation broker for its selection of a motor carrier to transport property in interstate commerce" relates to a freight broker's "core transportation-related services." *Aspen*, 65 F.4th at 1268. Accordingly, the Eleventh Circuit held that a plaintiff's state-law negligent hiring claim against a freight broker is preempted—according to ordinary preemption principles—by § 14501(c)(1) of the FAAAA.

Several years ago, in *Miller v. C.H. Robinson Worldwide, Inc.*, the Ninth Circuit considered two key features of the generally applicable common law claim: where in the chain of the defendant's business the law acted to compel a certain result (e.g., consumer or workforce) and what result it is compelling (e.g., a certain wage, non-discrimination, or a specific system of delivery). *Miller*, 976 F.3d at 1024 (citing *California Trucking Ass'n v. Su*, 903 F.3d 953, 966 (9th Cir. 2018), *cert. denied*, 149 S. Ct. 1331). The *Miller* court found that the selection of motor carriers is one of the core services of brokers, meaning the negligent hiring claim interferes not in the background of the business but rather at the point at which the broker arranges for transportation, where it is directly connected with broker services. However, it determined that that negligence claims against brokers, to the extent that they arise out of motor vehicle accidents, have the requisite "connection with" motor vehicles and

as such, the safety exception applies. As such, the negligence claims against brokers were not preempted by the FAAAA. *Miller*, 976 F.3d at 1025-31.

Here, Plaintiffs' claims allege: Coyote is vicariously liable for the conduct of Leksowski (Count III);[6] Coyote negligently and/or recklessly hired, supervised, retained, and selected Leksowski (Count IV);[7] Coyote negligently entrusted O'Connor "to ship its freight when it knew or should have known that O'Connor has a propensity for engaging in unsafe practices and hiring dangerous and poorly trained drivers such as Mr. Leksowski" (Count VI);[8] and all Defendants, including Coyote, engaged in a joint venture (Count IX).[9] (Doc. 29);

---

[6] To establish vicarious liability, "a plaintiff must show that the employee's conduct: (1) is of a kind and nature that he is employed to perform; (2) occurs substantially within the authorized time and space limits designated by his employer; and (3) is driven by a desire to serve the employer." *Schloss v. Sears Roebuck & Co.*, No. CIV.A. 04-CV-2423, 2005 WL 433316, at *2 (E.D. Pa. Feb. 24, 2005) (citing *Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998)).

[7] To establish a claim for negligent/reckless in hiring, retention, and supervising a plaintiff must show that an employer was "negligent or reckless 'in the employment of improper persons or instrumentalities in work involving risk of harm to others; . . . in the supervision of the activity; or . . . in permitting, or failure to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.' " *Doe v. Liberatore*, 478 F. Supp. 2d 742, 760 (M.D. Pa. 2007) (citing *R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692, 697 (Pa. Super. Ct. 2000)). *See also Doe v. Schneider,* 667 F. Supp. 2d 524, 531 (E.D. Pa. 2009). If this can be shown, then "an employer is subject to liability for harm resulting from" his employee's conduct." *Doe*, 478 F. Supp. 2d at 760 (citing *R.A. ex rel. N.A.*, 748 A.2d at 697).

[8] To prevail on a negligent entrustment claim in the instant context, a plaintiff must show that the defendant "(1) permitted [a third party], (2) to operate its [trailer], and (3) that [the defendant] knew or should have known that [the third party] intended to or was likely to use the [trailer] in such a way that would harm another." *Fakes v. Terry*, No. 15-CV-01574, 2018 WL 1382513, at *5 (W.D. Pa. Mar. 19, 2018) (citing *Knecht v. Balanescu*, 2017 WL 4573796 (M.D. Pa. 2017)); *see Whetstone v. Malone Bussing Servs.*, No. 2:19-CV-00071, 2019 WL 1459022, at *2-3 (W.D. Pa. Apr. 2, 2019).

[9] A joint venture requires that: "1) each party must make a contribution of capital, materials, services or knowledge; 2) profits must be shared; and 3) there must be a joint

*Bastone v. Golf Transportation, Inc.*, No. 3:22-CV-00878, ECF No. 1. As a broker, Coyote offers services in the form of "selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2) (defining "broker").

Coyote submits that Plaintiffs' claims against it are preempted by the FAAAA because the claims all relate, have a connection with, or reference the services provided by Coyote as a broker who "arranges, or offers to arrange, the transportation of property by an authorized motor carrier." (Doc. 125, at 22-23; Doc. 147, at 9). Coyote further argues that the claims are preempted because they focus on the output of services provided by Coyote as a broker, namely the process of arranging for transportation of the Subject Load by a motor carrier, Golf. (Doc. 125, at 29). Directing the Court's attention to the Federal Motor Carrier Safety Regulations ("FMCSRs"), which provide that a motor carrier is responsible to ensure that only a qualified driver is driving a commercial motor vehicle, Coyote avers that allowing Plaintiffs' claims to proceed would impose new services upon brokers that do not have to be performed under the FMCSRs. (Doc. 125, at 30; Doc. 147, at 13).

Plaintiffs respond that their state law negligence claims arising from personal injury traffic accidents are unrelated to the services of a broker and, therefore, are outside the scope of FAAAA preemption. (Doc. 137, at 12). For support, Plaintiffs rely on *Mann v. C.H. Robinson Worldwide, Inc.,* 2017 WL 3191516, at *7 (W.D. Va. July 27, 2017). (Doc. 137, at 13). *Mann* addresses "complete preemption" while the instant case concerns "ordinary

---

proprietary interest in and right of mutual control over the subject matter of the enterprise." *Ciotola*, 481 F.Supp.3d at 387 (quoting *Beavers v. West Penn Power Co.*, 436 F.2d 869, 873 (3rd Cir. 1971)). Once a party satisfies the test for a joint venture, the torts committed by one joint adventurer may be imputed upon other joint adventurers. *See Beavers*, 436 F.2d at 873; *Friedman v. Wilson Freight Forwarding Co.*, 181 F. Supp. 327, 329 (W.D. Pa. 1960).

preemption." *Mann*, 2017 WL 3191516, at *5-8. Unlike ordinary preemption, complete preemption is a "narrowly drawn jurisdictional rule for assessing federal removal jurisdiction when a complaint purports to raise only state law claims." *Geddes v. Am. Airlines, Inc.*, 321 F.3d 1349, 1353 (11th Cir. 2003). Thus, whether the FAAAA completely preempts tort claims against brokers has no bearing on whether Plaintiffs' claims against Coyote are within the scope of Section 14501(c)(1). *See Mann*, 2017 WL 3191516, at *7 ("[W]hether a claim relates to a 'price, route, or service[ ]' is an inquiry that can turn on the underlying facts of the specific causes of action."). Based on the analysis of the allegations supporting Plaintiffs' negligence claims above, the Court finds that Plaintiffs' claims, as alleged, relate to Coyote's services as a broker and concern the transportation of property.

Plaintiffs also urge the Court to adopt the holding in *Ciotola v. Star Transportation & Trucking, LLC*. (Doc. 137, at 13). As noted, *supra*, the court in *Ciotola* concluded that "Plaintiff's claims boil down to imposing a duty of ordinary and reasonable care upon [freight brokers]." *Ciotola*, 481 F.Supp.3d at 388. This is not the case here. Plaintiffs allege that Coyote breached duties owed by freight brokers, not the general public, which go beyond the duty to exercise reasonable care and relate directly to brokerage services. (Doc. 29); *Bastone v. Golf Transportation, Inc.*, No. 3:22-CV-00878, ECF No. 1. For example, Count VI states: "Defendants had a duty to use due care in choosing a careful and competent driver;" "a duty to ensure that it had appropriate hiring practices that put competent drivers behind the wheel;" "a duty to ensure that it had appropriate policies in place to ensure that its drivers did not violate FMCSA regulations;" and "a duty to entrust the Volvo and Wabash to an attentive and skilled driver." (Doc. 29, ¶¶ 110, 120, 121, 123); *Bastone v. Golf Transportation, Inc.*, No.

3:22-CV-00878, ECF No. 1. These duties go beyond the common law duty of ordinary care, and it is an oversimplification to characterize them as such.

Applying the two-part analysis described in *Bedoya*, the Court finds that Plaintiffs' state law negligence claims in Counts III, IV, VI, and IX are preempted because imposing Pennsylvania's common-law negligence liability upon Coyote would directly target and significantly impact the broker's services. First, unlike an industry input, such as labor, capital, and technology, which may impact prices charges and services provided to customers, Plaintiffs' claims directly focus on Coyote's output—to arrange for transportation by hiring a motor carrier to transport shipments. *See Montoya*, 404 F.Supp.3d at 401 (citing *Bedoya*, 914 F.3d at 821). Plaintiffs' claims focus on the core service provided by Coyote because they are based entirely upon Coyote's decision to select Golf as the motor carrier to transport the Subject Load. *See Ye*, 2023 WL 4567097, at *4; *Aspen*, 65 F.4th at 1268; *Miller*, 976 F.3d at 1024. Second, Plaintiffs' claims have a significant impact on Coyote's service with respect to the transportation of property because the claims seek to enforce a duty of care related to how Coyote, the broker, arranges for a motor carrier to transport shipments, the service. *See Creagan v. Wal-Mart Transportation, LLC*, 354 F.Supp.3d 808, 813 (N.D. Ohio 2018). Application of the negligence law would require Coyote to perform additional services, such as hiring, retaining, and supervising a qualified driver in driving a commercial motor vehicle, which would in turn subject Coyote to a patchwork of laws throughout the county; impose compliance with new regulations; carry a substantial financial consequence; and expose brokers to additional liability. *See Bedoya*, 914 F.3d at 823. Therefore, the Court finds that enforcing laws upon a broker for vicarious liability, for negligent hiring/supervision/retention/selection/entrustment of a driver, and for joint venture would

24

have a significant direct impact upon the services rendered by a broker and hinder the objectives of the FAAAA. Accordingly, the Court finds that Plaintiffs' claims against Coyote are preempted under the FAAAA.

B. THE SAFETY REGULATION EXCEPTION

Plaintiffs next submit that even if their negligence claims fall within the scope of Section 14501(c), they are not preempted because they fall within the "safety regulation exception" in Section 14501(c)(2)(A). (Doc. 137, at 14). As noted above, the safety exception in § 14501(c)(2)(A) provides that laws within a state's "safety regulatory authority . . . with respect to motor vehicles" are not preempted. For Plaintiffs' claims to fall within the safety exception, (1) the negligence standard must constitute an exercise of Pennsylvania's "safety regulatory authority," and (2) that authority must have been exercised "with respect to motor vehicles." 49 U.S.C. § 14501(c)(2)(A).[10]

_____

[10] Plaintiffs submit that the Court should adopt the *Miller* court's application of the safety exception to personal injury claims against a freight broker, suggesting that the Supreme Court affirmed that decision by denying the petition for a writ of certiorari. (Doc. 137, at 18). According to Plaintiffs, the Supreme Court invited the Solicitor General to file an amicus curiae brief on October 4, 2021, "expressing the views of the United States" before deciding the broker's petition for writ of certiorari. (Doc. 137, at 18-19). The Solicitor General authored an amicus curiae brief, on behalf of the United States, concluding that in *Miller*, "[t]he Court of Appeals correctly applied the FAAAA's safety exception." (Doc. 137-8, at 7). Plaintiffs aver that that since the Supreme Court denied the broker-defendant's writ of certiorari 34 days after the Solicitor General submitted its brief, the Supreme Court was "satisfied with the United States' embracing *Miller*." (Doc. 137, at 21). Conversely, Coyote explains that the denial of certiorari was the typical one sentence opinion that "[p]etition for writ of certiorari to the United States Court of Appeals for the Ninth Circuit denied." (Doc. 147, at 14). The Court agrees with Coyote that the Supreme Court's denial of a writ of certiorari "does not constitute a ruling on the merits," *Knight v. Florida*, 528 U.S. 990, 990 (1999), or "signify that the Court necessarily agrees with the decision (much less the opinion) below." *Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634, 635 (2019).

25

Regarding the first part of the safety exception, Plaintiffs contend "Congress' clear purpose in § 14501(c)(1) is to regulate economics, and the 'safety regulatory authority of a state' encompasses personal injury tort claims for purposes of § 14501(c)(2)(A)." (Doc. 137, at 14); *see, e.g., Miller*, 976 F.3d a 1026-27; *Aspen*, 65 F.4th at 1268-70. In opposition, Coyote argues that Plaintiffs' claims, which are common-law provisions, are not part of a state regulatory scheme regulating the activity of freight brokers. (Doc. 125, at 36-37). The Court declines to address this issue, finding that Plaintiffs' claims fail to satisfy the second half of the safety exception. In short, the Court finds that a common law negligence claim enforced against a broker is not a law that is "with respect to motor vehicles."

The Supreme Court has broadly interpreted "with respect to" to mean "concern[s]," but specifically limited the exception laws to those that concern "motor vehicles." *See Dan's City*, 569 U.S. at 261 (quoting *Ours Garage*, 536 U.S. at 449 (Scalia, J., dissenting)). In *Ye*, the Seventh Circuit determined that the safety exception does not apply to a plaintiff's negligence claims against a freight broker after conducting the following statutory analysis:

> We first recognize Congress's express use in § 14501(c)(2)(A) of a statutorily defined term—"motor vehicles." By limiting the safety exception to apply to state laws "with respect to motor vehicles," Congress narrowed the scope of the exception to those laws concerning a "vehicle, machine, tractor, trailer, or semitrailer . . . used on a highway in transportation." 49 U.S.C. § 13102(16) (defining "motor vehicle"). We see no mention of brokers in the safety exception itself or in Congress's definition of motor vehicles, which suggests that such claims may be outside the scope of the exception's plain text. See *Dan's City Used Cars*, 569 U.S. at 261–62, 133 S.Ct. 1769 (concluding that a state's law was not "with respect to transportation of property" under § 14501(c)(1) where it concerned post-towing storage, which does not constitute "transportation" as defined in § 13102(23)(B)).

> Looking beyond the clause containing the safety exception, § 14501(c)(2)(A) goes on to preserve a state's authority "to impose highway route controls or limitations based on the size or weight of a motor vehicle or the hazardous nature of the cargo" and to regulate motor carriers' "insurance requirements."

26

Notice the specificity throughout § 14501(c)(2)(A): after broadly preempting state laws related to the prices, routes, and services of brokers and motor carriers in § 14501(c)(1), Congress carefully excepted state laws for motor vehicle safety, cargo loads, and motor carrier insurance.

Now notice what is missing from § 14501(c)(2)(A)—any reference to brokers or broker services. While it listed broker services in § 14501(c)(1)'s express preemption provision, Congress declined to expressly mention brokers again in reference to states' safety authority. Reading further, we see the same omission of brokers from § 14501(c)(2)'s other savings provisions for "intrastate transportation of household goods" and "tow truck operations." *Id.* § 14501(c)(2)(B), (C).

Remember, too, that § 14501(c) sets forth federal authority over "Motor Carriers of Property"—not brokers—so Congress's inclusion of brokers in one subsection and exclusion in another suggests that the omission was intentional. *See Rotkiske v. Klemm*, —— U.S. ——, 140 S. Ct. 355, 361, 205 L.Ed.2d 291 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."). Congress could have chosen to save state safety laws enforced "with respect to motor carriers and brokers," but it did not. We hesitate to read broker services into parts of the statute where Congress declined to expressly name them, especially when it contemplated them elsewhere within the same statutory scheme. *See id.* at 360–61 ("It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.' " (alteration in original) (quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 94 (2012))).

Congress's omission of brokers from the exceptions to § 14501(c)(1)'s preemptive sweep is even more pronounced when we take a step back and examine other provisions within § 14501. What most stands out is § 14501(b), titled "Freight Forwarders and Brokers." In § 14501(b)(1) Congress directly addressed state regulation of brokers by prohibiting states from enacting or enforcing laws "relating to intrastate rates, intrastate routes, or intrastate services of any freight forwarder or broker." Following this broad preemption provision, however, Congress did not include a safety exception—another telling omission given that Congress included safety exceptions to the parallel preemption provisions for motor carriers of property (at issue here) and motor carriers of passengers. *See id.* § 14501(a)(2), (c)(2)(A). Here, too, Congress's decision not to write a safety exception for the broker-specific preemption provision indicates a purposeful separation between brokers and motor vehicle safety.

*Ye*, 2023 WL 4567097, at 5-6.

27

Therefore, the Seventh Circuit concluded that the safety exception "requires a direct link between a state's law and motor vehicle safety," the court found "no such direct link between negligent hiring claims against brokers and motor vehicle safety." *Ye*, 2023 WL 4567097, at 5-6. Notably, the Ninth Circuit "dr[e]w the line where Congress did—at state safety regulations directly related to 'motor vehicles.'"[11] *Ye*, 2023 WL 4567097, at 7.

Similarly, the Eleventh Circuit concluded that the "phrase 'with respect to motor vehicles' limits the safety exception's application to state laws that have a *direct* relationship to motor vehicles." *Aspen*, 65 F.4th at 1271 (emphasis in original). Using the canons of construction to avoid redundancy and surplusage, the court examined the definitions of "broker" and "motor carrier" under the FAAAA and observed that, by definition, only a motor carrier can "provide motor vehicle transportation for compensation." *Aspen*, 65 F.4th at 1271 (citing 49 U.S.C. §§ 13102(2), 13102(14)). The court also noted that a "motor vehicle" is a "vehicle, machine, tractor, trailer or semitrailer propelled or drawn by mechanical power and used on a highway in transportation." *Aspen*, 65 F.4th at 1271-72 (citing 49 U.S.C. § 13102(16)). Consequently, the court explained that in cases of negligent hiring claims against brokers, regardless of whether the injury is lost property or bodily injury, "a mere indirect connection between state regulations and motor vehicles will not invoke the [Act]'s safety

---

[11] The *Ye* court further explained that "[l]ooking beyond § 14501 to the other provisions of Title 49 further reinforces our narrow reading of the phrase 'with respect to motor vehicles' in § 14501(c)(2)(A)'s safety exception." *Ye*, 2023 WL 4567097, at 7 (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("[A] reviewing court should not confine itself to examining a particular statutory provision in isolation [because] [t]he meaning . . . of certain words or phrases may only become evident when placed in context."); *Sackett v. EPA*, 143 S. Ct. 1322, 1338 (2023) (considering the broader context of the Clean Water Act to derive the meaning of "wetlands" in one provision of the Act (citing *Brown & Williamson Tobacco*, 529 U.S. at 132))).

exception." *Aspen*, 65 F.4th at 1272. Therefore, the Eleventh Circuit concluded that the plaintiff's negligence claims against a freight broker were preempted and the safety exception did not save those claims. *Aspen*, 65 F.4th at 1272.

Here, Plaintiffs allege that Coyote was "negligent in entrusting O'Connor to ship its freight when it knew or should have known that O'Connor has a propensity for engaging in unsafe practices and hiring dangerous and poorly trained drivers such as Mr. Leksowski." (Doc. 29, ¶ 117); *Bastone v. Golf Transportation, Inc.*, No. 3:22-CV-00878, ECF No. 1. In addition, Plaintiffs assert that "Coyote knew or should have known that Defendant O'Connor had an unsafe history in performing services as a motor carrier . . . ." (Doc. 29, ¶ 118); *Bastone v. Golf Transportation, Inc.*, No. 3:22-CV-00878, ECF No. 1. Plaintiffs rely on the Ninth Circuit's decision in *Miller*, 976 F.3d 1016. (Doc. 137, at 21-22). In *Miller*, the plaintiff sought to recover damages from a freight broker that he alleged was negligent in hiring an unsafe motor carrier whose driver caused a highway accident leaving the plaintiff a quadriplegic. *Miller*, 976 F.3d at 1020. As noted above, the court determined that selection of a motor carrier strikes at the core function of a broker and while state negligence laws do not specifically dictate brokers' services, they nevertheless impose "an obligation on brokers at the point at which they arrange for transportation by [a] motor carrier," and thus "related to" brokers' services. *Miller*, 976 F.3d at 1024-25. At the same time, the court found that the claims were saved by the safety exception, interpreting "with respect to motor vehicles" broadly to support exemption of state laws with an indirect link to motor vehicles, including negligent hiring claims against brokers. *Miller*, 976 F.3d at 1030-31. "If criminal history disclosure requirements for tow truck drivers have the requisite 'connection with' motor vehicles, then negligence claims against brokers that arise out of motor vehicle accidents must as well:

Neither directly regulates motor vehicles, but both promote safety on the road." *Miller*, 976 F.3d at 1030. Coyote retorts that "if the safety exception persevered all claims related to motor vehicles, as urged by . . . *Miller*, all preempted claims would then be 'saved' by the exception.'" (Doc. 125, at 37) (citing *Creagan*, 354 F.Supp.3d at 814).

The Court finds that Plaintiffs' claims are not saved from FAAAA preemption by the safety exception. The plain language of the exception does not mention common law tort claims or brokers' services in selecting motor carriers, whereas the words "law" and "broker" are expressly included in the general preemption provision. *Compare* 49 U.S.C. § 14501(c)(2)(A), *with* § 14501(c)(1). A "broker" is "a person . . . that . . . sell[s], provid[es], or arrang[es] for, transportation by motor carrier for compensation," 49 U.S.C. § 13102(2), and a "motor carrier," in turn, is "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). A "broker," by definition, may not provide motor vehicle transportation for compensation; only a "motor carrier" may perform that task. *See* 49 U.S.C. § 13102(2) (A "broker" is "a person, *other than a motor carrier*") (emphasis added); 49 C.F.R. § 371.2(a) ("Motor carriers . . . are not brokers within the meaning of this section when they arrange ... the transportation of shipments which they . . . have accepted . . . to transport."). Finally, a "motor vehicle" is "a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation." 49 U.S.C. § 13102(16). In light of these definitions, a claim against a broker is necessarily one step removed from a "motor vehicle" because the "definitions make clear that . . . a broker . . . and the services it provides have no direct connection to motor vehicles." *Miller*, 976 F.3d at 1031 (Fernandez, J., concurring in part and dissenting in part). Therefore, Plaintiffs' claims do not concern the regulation of motor vehicle safety because Coyote, a broker, and the

30

services it provides, arranging transportation of shipments by a motor carrier, have no direct connection to motor vehicles. *See Aspen*, 65 F.4th at 1272.

Next, similar to the facts in *Ye*, Plaintiff's allegations "mirror practical realities: [Coyote] does not own or operate motor vehicles like [Golf or O'Connor] does." *Ye,* 2023 WL 4567097, at 6. Considering the connection between Coyote as a broker and motor vehicle safety requirements necessitates an additional "link" to connect the alleged chain of events: Coyote's negligent hiring of Golf resulted in Golf's double brokering of the Subject Load to O'Connor, which resulted in O'Connor's negligent entrustment of a motor vehicle to a negligent driver, Leksowski, who, in turn, caused a collision that resulted in Lee's and Bastone's deaths. (Doc. 29); *Bastone v. Golf Transportation, Inc.*, No. 3:22-CV-00878, ECF No. 1. This additional step prevents Plaintiffs' negligence claims against Coyote from falling within the FAAAA's safety exception in § 14501(c)(2)(A). The FAAAA's text "makes clear that Congress views motor vehicle safety regulations separately and apart from those provisions imposing obligations on brokers," such that the connection between a broker hiring standard and motor vehicles is "too attenuated to be saved under § 14501(c)(2)(A)." *Ye*, 2023 WL 4567097, at 6 ("And this separateness counsels a reading of 'with respect to motor vehicles' that requires a direct connection between the potentially exempted state law and motor vehicles. Any other construction would expand the safety exception's scope without a clear, text-based limit.").

Therefore, the Court finds that Plaintiffs' claims against Coyote are preempted by the FAAAA and are not saved by the safety exemption of 49 U.S.C. § 14501(c)(2)(A). Accordingly, Coyote's motion for summary judgment is GRANTED and Plaintiffs' claims against Coyote are DISMISSED with prejudice.

IV.    CONCLUSION

For the foregoing reasons, Coyote's motion for summary judgment is **GRANTED**. (Doc. 123).

An appropriate Order follows.


                                          **BY THE COURT:**


**Date: November 7, 2023**              *s/ Karoline Mehalchick*
                                          **KAROLINE MEHALCHICK**
                                          **Chief United States Magistrate Judge**